UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

_____
                                        )
**UNITED STATES OF AMERICA and**        )
**STATE OF TEXAS,**                     )
                                        )
                **Plaintiffs,**  )
                                        )
    v.                                )   Case No. 3:21-cv-335
                                        )
**KIRBY INLAND MARINE, LP,**            )
                                        )
                **Defendant.**  )
_____)

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and acting at the request of the Department of the Interior through the Fish and Wildlife Service ("FWS") and the National Park Service ("NPS") and the Department of Commerce ("DOC") through the National Oceanic and Atmospheric Administration ("NOAA"), and the State of Texas (the "State"), appearing through the Office of the Texas Attorney General on behalf of the Texas General Land Office ("TGLO"), the Texas Commission on Environmental Quality ("TCEQ"), and the Texas Parks and Wildlife Department ("TPWD"), file this Complaint and allege as follows:

## NATURE OF THE CASE

1. This is a civil action brought against Defendant Kirby Inland Marine, LP ("Kirby" or "Defendant") for recovery of damages for injuries to, destruction of, loss of, or loss of use of natural resources, under Section 1002 of the Oil Pollution Act ("OPA"),

1

33 U.S.C. § 2702. Plaintiffs seek to recover natural resource damages ("NRD") for injuries resulting from the March 2014 discharge of oil that occurred in the Houston Ship Channel from an oil barge owned and operated by Kirby.

2. The oil spill occurred on March 22, 2014, after a Kirby towboat pushing two Kirby oil barges tried to cross in front of a 585-foot-long deep-draft bulk cargo ship that was traveling in the Houston Ship Channel in the vicinity of the Texas City Y crossing. The lead Kirby oil barge was struck, a tank ruptured, and approximately 4,000 barrels (168,000 gallons) of marine fuel oil spilled into the waters of the Houston Ship Channel. The oil flowed out of the Channel, into Galveston Bay, and then spread into the Gulf of Mexico and down the Texas coastline.

3. Approximately 160 miles of shoreline were oiled as a result of the spill, including sensitive marsh habitat, the national wildlife refuge on Matagorda Island, Mustang Island State Park, and Padre Island National Seashore. Natural resources killed or harmed by the spill include birds, dolphins and other marine life, waters of the United States and the State, marshes, beaches, and subtidal habitats. The spill also resulted in losses to recreational users of the marine and coastal environment in the spill impact area, which stretched from Galveston-area beaches to beaches as far south as Padre Island National Seashore near Corpus Christi.

4. Plaintiffs seek damages under OPA to compensate for and restore natural resources and natural resource services injured by the oil discharge. Plaintiffs also seek to recover their remaining unreimbursed assessment and restoration planning costs.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and Section 1017(b) of OPA, 33 U.S.C. § 2717(b). The Court also has jurisdiction over Defendant.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and Section 1017(b) of OPA, 33 U.S.C. § 2717(b), because Defendant resides and does business in this district and the oil discharge occurred in this district.

## STATUTORY BACKGROUND

7. Section 1002(a) of OPA, 33 U.S.C. § 2702(a), provides that "each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in [33 U.S.C. § 2702(b)] that result from such incident."

8. Section 1001(32)(A) of OPA, 33 U.S.C. § 2701(32)(A), defines "responsible party" to include, in the case of a vessel, "any person owning, operating, or demise chartering the vessel."

9. Section 1001(27) of OPA, 33 U.S.C. § 2701(27), defines "person" to include a corporation.

10. Section 1001(37) of OPA, 33 U.S.C. § 2701(37), defines "vessel" to mean "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water, other than a public vessel."

11. Section 1001(23) of OPA, 33 U.S.C. § 2701(23), defines "oil" to mean "oil

of any kind or in any form, including petroleum."

12. Section 1001(7) of OPA, 33 U.S.C. § 2701(7), defines "discharge" to mean "any emission (other than natural seepage), intentional or unintentional," and to include "spilling, leaking, pumping, pouring, emitting, emptying, or dumping."

13. Section 1001(21) of OPA, 33 U.S.C. § 2701(21), defines "navigable waters" to mean "the waters of the United States, including the territorial seas."

14. Section 1002(b)(2) of OPA, 33 U.S.C. § 2702(b)(2), provides that the "damages" referred to in Section 1002(a) of OPA, 33 U.S.C. § 2702(a), include "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee."

15. Section 1001(20) of OPA, 33 U.S.C. § 2701(20), defines "natural resources" to include "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government."

16. Section 1001(14) of OPA, 33 U.S.C. § 2701(14), defines "incident" to mean "any occurrence or series of occurrences having the same origin, involving one or more vessels . . . , resulting in the discharge . . . of oil."

17. The trustees for the natural resources injured by the oil discharge include DOI through FWS and NPS and DOC through NOAA, on behalf of the United States,

and TGLO, TCEQ, and TPWD on behalf of the State of Texas (collectively, the "Trustees").

18. DOI through FWS and NPS and DOC through NOAA are the designated United States trustees pursuant to Section 1006(b)(2) of OPA, 33 U.S.C. § 2706(b)(2), Subpart G of the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") (40 C.F.R. § 300.600, *et seq.*) and Executive Order 12580 (3 C.F.R., 1987 Comp. p. 193, 52 Fed. Reg. 2923 (January 23, 1987) as amended by Executive Order 12777 (56 Fed. Reg. 54757 (October 22, 1991)).

19. TGLO, TCEQ, and TPWD are designated as state trustees by the Governor of Texas pursuant to Section 1006(b)(3) of OPA, 33 U.S.C. § 2706(b)(3), and subpart G of the NCP, 40 C.F.R. § 300.605.

20. Pursuant to OPA, the Trustees are acting on behalf of the public to seek damages for the injury to, destruction of, loss of, or loss of use of natural resources resulting from the discharge of oil.

## FACTS

A. The Source of the Oil Discharge

21. Kirby owned and operated the towboat the *Miss Susan* at the time of the oil discharge on March 22, 2014.

22. The *Miss Susan* measures 70 feet long, 28 feet across, and 10 feet deep, and is an 1,800-horsepower towing vessel weighing 131 gross tons.

23. Kirby owned and operated the oil barges the *Kirby 27705* and the *Kirby 27706*, which were connected to and being pushed by the *Miss Susan* at the time of the

5

oil discharge.

24. Each barge measured 300 feet long, 54 feet across, and 12 feet deep.

25. The *Kirby 27706* was a double-hulled marine barge outfitted with several 4,000-barrel storage tanks, capable of carrying liquid petrochemical products, including oil. At the time of the oil discharge, the barge was transporting marine fuel oil.

### B. The Collision and Oil Discharge

26. The marine vessel the *Summer Wind* is a deep-draft bulk cargo ship that measures 585 feet long, 100 feet wide, and 52.5 feet deep, and weighs 25,503 gross tons.

27. At approximately 11:15 a.m. on March 22, 2014, the *Miss Susan* departed from the port at Texas City, bound for Port Bolivar, Texas, to await berth availability at the final destination of Galveston, Texas.

28. When the *Miss Susan* departed the port at Texas City, the vessel was pushing the *Kirby 27706* and the *Kirby 27705*, and the three vessels were lined up in an end-to-end configuration with *Kirby 27706* in the lead position, for a total length of approximately 670 feet.

29. On the morning of March 22, 2014, the *Kirby 27705* and the *Kirby 27706* were each loaded with nearly one million gallons of marine fuel oil.

30. By approximately 12:15 p.m. on March 22, 2014, the *Miss Susan* was approaching the busy "Texas City Y" area, which is where the Houston Ship Channel, the Texas City Channel, the Bolivar Roads Channel, and the Intracoastal Waterway intersect.

31. On the morning of March 22, 2014, before and at the time of the discharge,

there was significantly reduced visibility in the Texas City Y area due to fog.

32.     Due to the poor visibility in the Texas City Y area, at about 7:00 a.m. on the morning of March 22, 2014, the Houston Pilots Association had suspended pilot boardings of inland-bound deep-draft vessels.

33.     At approximately 12:00 p.m., the *Summer Wind* was the first deep-draft vessel authorized to depart, after the 7:00 a.m. suspension of pilot boardings set by the Houston Pilots Association, from anchorage inbound toward Houston.

34.     As a deep-draft cargo vessel, the *Summer Wind* is supposed to navigate in the Texas City Y area only in the confines of the ship channels. Pursuant to applicable Inland Navigation Rules, the *Summer Wind* had the right of way in the Houston Ship Channel as between it and the *Miss Susan*.

35.     It is customary for vessels navigating in and around the Texas City Y area to broadcast their navigation plans and to make passing arrangements via radio channel 13.

36.     At approximately 12:10 p.m., the pilot of the *Summer Wind* made a radio call over channel 13 wherein he indicated that the ship was leaving anchorage inbound to Houston. The *Summer Wind* was also visible on navigational monitoring instruments, including those onboard the *Miss Susan*.

37.     At approximately 12:24 p.m., the *Miss Susan*, which had been traveling eastbound in the Texas City Channel, commenced a port turn into the current in order to prepare to cross the Houston Ship Channel.

38.     At the time that the *Miss Susan* and the Kirby barges were approaching the

7

Houston Ship Channel, the waterway was influenced by a "flood tide" of approximately 1 knot. The resulting current acted as a drag on the *Miss Susan* and the Kirby barges, slowing their speed.

39. Also at that time, fog was still present in the intersection of the Houston Ship Channel where the *Miss Susan* intended to cross and the *Summer Wind* was approaching.

40. At about 12:25 p.m., the *Summer Wind* was approaching the area of the Houston Ship Channel that the *Miss Susan* was attempting to cross, moving at a speed of almost 10 knots, and a "close quarters" situation was developing between the vessels.

41. At approximately 12:29 p.m., the captain of another tow operating in the area, the *Mission*, radioed the *Miss Susan* and provided a further alert to the situation. The *Mission* asked, "[h]ey you going to be [. . .] beating [the *Summer Wind*] across the intersection there?" The *Miss Susan* responded, "I'm going to be crossing the intersection there in a minute, over." The *Mission* captain replied, "[y]eah, that's what I'm saying, you going to beat him across? Are you gonna be across before [the *Summer Wind*] gets down here?" The *Miss Susan* stated, "Roger."

42. It was not until around 12:31 p.m. that the *Miss Susan* made its first direct communication with the *Summer Wind* over radio channel 13.

43. At approximately 12:32 p.m., the pilot of the *Summer Wind* responded to the *Miss Susan* over the radio that, "if you keep on going, I'm going to get you unless you're doing about 7 or 8 knots 'cause right now I'm less than three quarters of a mile from you [and] you ain't got to the [Houston Ship Channel] yet."

44. At the time the vessels were approaching one another, the *Miss Susan*'s speed had slowed considerably under the influence of the flood tide, to approximately 3.5 knots.

45. At about 12:35 p.m., the *Summer Wind*'s bow struck the lead barge, the *Kirby 27706*, halfway down its starboard side.

46. The collision pierced the hull of the *Kirby 27706* tank barge and ruptured one of the oil storage tanks. The barge released approximately 4,000 barrels (168,000 gallons) of marine fuel oil into the waterway.

47. The collision and oil spill could have been avoided had Kirby's vessels not tried to cross in front of the *Summer Wind* in the Houston Ship Channel at the time and under the conditions that it did so.

48. On the day of the collision and oil spill, the United States Coast Guard Captain of the Port ordered the Houston Ship Channel closed to prevent wakes of large vessels from moving oil toward the shorelines. The Houston Ship Channel remained closed for five days as a result of the oil spill.

49. Kirby, the United States Coast Guard, and the State responded to the spill and conducted and monitored months of cleanup efforts. Kirby also entered into a cooperative agreement with the Trustees for natural resource injury assessment.

### C. Impacts to Natural Resources and Recreational Services

50. The Trustees conducted extensive natural resource injury assessment work. The Trustees used information from the response and assessment work, including field observations, research and analysis of the specific oil chemistry involved in the

discharge, oil toxicity from literature and studies, and modeling to determine the extent of injuries and the compensatory restoration requirements for the oil discharge. The Trustees collectively coordinated their assessment work and will jointly plan and implement restoration efforts.

51. The marine fuel oil that discharged from the Kirby barge spread with the currents and winds into Galveston Bay, the Gulf of Mexico, and south along Galveston Island and down the Texas coastline as far south as Padre Island National Seashore.

52. Marine fuel oil that spills into the environment is known to be harmful to terrestrial and aquatic life.

53. Numerous types of birds and other terrestrial and aquatic life are known to inhabit the areas impacted by the oil discharge. Terrestrial wildlife includes, but is not limited to, a wide variety of resident and migratory birds. Aquatic life includes, but is not limited to, dolphins, finfish, crustaceans, and shellfish.

54. At least 160 miles of Texas shoreline, including multiple environmentally sensitive areas, were contaminated by Kirby's oil spill just as the migratory shorebird season was approaching.

55. One of the sensitive areas impacted by the spill was the Matagorda Island Unit of the Aransas National Wildlife Refuge. Matagorda Island is a 38-mile-long barrier island located over 120 miles southwest of Galveston that contains about 26,000 acres of salt marsh and tidal flats and supports a wide variety of migratory birds, including federally listed threatened or endangered species such as the critically endangered Whooping Crane.

56. Common bottlenose dolphins can be found in aquatic habitats throughout the Texas coastline. There are seven dolphin stocks (demographically independent populations) present in the inshore and coastal areas impacted by Kirby's oil spill. One of the largest resident dolphin populations in Texas, extensively studied since the 1980s, is found in Galveston Bay. The Texas City Y area (also known as Bolivar Roads), in particular, is an area that features high dolphin density because its deepwater channels provide important dolphin habitat.

57. The discharged oil killed and harmed birds, dolphins, and other aquatic life and contaminated waters and aquatic and shoreline habitats, including subtidal areas, marshes, and beaches. During the oil spill response and cleanup, dead and oiled birds, dolphins, and other marine life were observed in the oiled waterways and along the shoreline.

58. The discharged oil also resulted in losses to recreational users of the marine and coastal environment along the Texas coast. Recreational activities such as beach use, boating, and fishing were impacted due to direct oiling, closures and advisories, and the reasonable expectation of oiling as a result of the spill. The presence of oil on beaches or in the water degraded the quality of or accessibility to recreational activities.

## CLAIM FOR RELIEF

**Natural Resource Damages under Section 1002 of OPA**

59. The preceding paragraphs are realleged and incorporated herein by reference.

60. On March 22, 2014, Kirby discharged approximately 4,000 barrels of

marine fuel oil from one of its barges into the Houston Ship Channel at the Texas City Y crossing. Oil discharged from the barge into the waterway and polluted parts of the Houston Ship Channel, Galveston Bay, the Gulf of Mexico, Matagorda Island, and the Texas coastline.

61. Kirby is the "responsible party" for Kirby's tank barge *Kirby 27706* within the meaning of Section 1001(32)(A) of OPA, 33 U.S.C. § 2701(32)(A).

62. Kirby is a corporate entity and a "person" within the meaning of Section 1001(27) of OPA, 33 U.S.C. § 2701(27).

63. At the time of the oil discharge, Kirby was the owner and operator of the tank barge.

64. Kirby's tank barge is a "vessel" within the meaning of Section 1001(37) of OPA, 33 U.S.C. § 2701(37).

65. The spilling of oil from the Kirby tank barge was a "discharge" within the meaning of Section 1001(7) of OPA, 33 U.S.C. § 2701(7). Approximately 4,000 barrels of oil (168,000 gallons) discharged into waters of the United States and the State.

66. The discharged material was "oil" within the meaning of Section 1001(23) of OPA, 33 U.S.C. § 2701(23).

67. The Houston Ship Channel is a "navigable water" of the United States within the meaning of Section 1001(21) of OPA, 33 U.S.C. § 2701(21).

68. The oil discharge polluted portions of the Houston Ship Channel, Galveston Bay, the Gulf of Mexico, Matagorda Island, and the Texas coastline where it washed ashore roughly between the collision site and Padre Island National Seashore.

69. The oil discharge caused injury to, destruction of, loss of, or loss of use of "natural resources" belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States or the State within the meaning of Section 1001(20) of OPA, 33 U.S.C. § 2701(20), including coastal shoreline habitats, birds, dolphins, other aquatic life, and recreational use.

70. Plaintiffs have incurred costs in assessing injuries to natural resources resulting from the oil spill and in their initial restoration planning.

71. Pursuant to Section 1002(a) and (b)(2) of OPA, 33 U.S.C. § 2702(a) and (b)(2), Kirby is liable to the United States and to the State for damages for injury to, destruction of, loss of, or loss of use of natural resources, including the reasonable costs of assessing such injury, destruction, loss, or loss of use resulting from the discharge of oil from Kirby's vessel as alleged in this Complaint.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

    A. Award Plaintiffs a judgment against Defendant Kirby Inland Marine, LP for all damages for injury to, destruction of, loss of, or loss of use of natural resources, including reimbursement of Plaintiffs' assessment and restoration planning costs; and

    B. Award Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


  *s/ Jason T. Barbeau*
JASON T. BARBEAU
Senior Trial Attorney (D.C. Bar No. 468200)
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044
(202) 616-8908 (telephone)
(202) 616-6584 (facsimile)
jason.barbeau@usdoj.gov

JENNIFER LOWERY
Acting United States Attorney
Southern District of Texas

DANIEL DAVID HU
Chief, Civil Division (Texas Bar No. 10131415)
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX 77002
Phone: (713) 567-9518
E-mail: daniel.hu@usdoj.gov

OF COUNSEL:

Amy Horner Hanley
Senior Attorney Advisor
U.S. Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
Washington, DC 20240

Corinna McMackin
Attorney-Advisor
Natural Resources Section
NOAA General Counsel Office
55 Great Republic Drive
Gloucester, MA 01930

**FOR THE STATE OF TEXAS:**

        KEN PAXTON
        Attorney General of Texas

        BRENT WEBSTER
        First Assistant Attorney General

        GRANT DORFMAN
        Deputy First Assistant Attorney General

        SHAWN COWLES
        Deputy Attorney General for Civil Litigation

        PRISCILLA M. HUBENAK
        Chief, Environmental Protection Division


        *s/ David Terry\**
        DAVID TERRY
        Assistant Attorney General
        Attorney-in-Charge
        State Bar No. 24079447
        Southern District Bar No. 3484820
        David.Terry@oag.texas.gov

        Office of the Attorney General of Texas
        Environmental Protection Division
        P.O. Box 12548, MC-066
        Austin, TX 78711-2548
        Telephone: 512-475-4152
        Facsimile: 512-320-0911

        COUNSEL FOR THE STATE OF TEXAS ON
        BEHALF OF THE TEXAS GENERAL LAND

                                      OFFICE, THE TEXAS PARKS AND WILDLIFE
                                      DEPARTMENT, AND THE TEXAS COMMISSION
                                      ON ENVIRONMENTAL QUALITY

\* Counsel for the State of Texas provided consent for the placement of his electronic signature on this pleading.